UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-12096-GAO

LYNN BRENNER,
Plaintiff

v.

METROPOLITAN LIFE INSURANCE COMPANY and SOUTHERBORO MEDICAL
GROUP, INC.,
Defendants.

ORDER ADOPTING REPORT AND RECOMMENDATION
March 23, 2015

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has recommended that
Metropolitan Life Insurance Company's ("MetLife") motion for summary judgment be granted
and that Southboro Medical Group, Inc.'s ("SMG") motion for summary judgment be denied.
The plaintiff and SMG have since filed objections to the Report and Recommendation ("R&R").

## I.    Lynn Brenner's Objections

Brenner contends that the R&R erred in disregarding substantial evidence of MetLife's
involvement in decisions regarding her husband's insurance. However, the R&R acknowledges
these materials and concludes that the only evidence Brenner has presented as to
communications between broker Robert Muenzberg and SMG's Director of Human Resources
Kathryn Tomashunas is inadmissible hearsay. See Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir.
2012) (explaining that hearsay evidence cannot be considered for the truth of the matter asserted
at summary judgment). In her objection, Brenner argues for the first time that this evidence is not
being offered for its truth, but to show the fact of MetLife's involvement in these decisions.

Brenner did not present this argument in her opposition (when she had a full opportunity to rebut MetLife's hearsay claims), and an objection to an R&R is not the proper venue to present new legal arguments. Paterson-Leicht Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988) ("[Rule 72(b)] does not permit a litigant to present new initiatives to the district judge.").

Brenner also argues that the magistrate judge erred in concluding that MetLife was not required to send conversion notice. The magistrate judge provided a detailed and careful discussion of the relevant provisions of the SMG plan and pertinent case law, and I agree with that analysis.

## II.    SMG's Objections

SMG contends that the magistrate judge relies too heavily on emails exchanged between the plaintiff and Tomashunas. Specifically, SMG argues that these communications do not demonstrate that Tomashunas (and therefore SMG) had an affirmative duty to inform the plaintiff of issues regarding Mr. Brenner's life insurance coverage.

In Watson v. Deaconess Waltham Hosp., 298 F.3d 102 (1st Cir. 2002), the First Circuit explained that an ERISA fiduciary has an affirmative duty to convey material information about a plan to beneficiaries when there is "some particular reason that the fiduciary should have known that his failure to convey the information would be harmful." Id. at 114-15. I agree with the magistrate judge's analysis that the communications could support a finding of an affirmative duty in this case. In her emails, the plaintiff repeatedly sought information regarding her husband's various insurance plans, at one point inquiring as to the monthly payout for his life insurance. (Emails, Ex. C at 6 (dkt. no. 58-3).) The emails repeatedly touch on the gravity of Mr. Brenner's medical condition, with the plaintiff informing Tomashunas that her husband "still

cannot talk or write" and remained in the intensive care unit. (Id. at 2, 5.) At the very least, these communications raise a genuine issue of material fact as to whether Tomashunas owed such a duty to the plaintiff, which is all that is necessary to survive summary judgment.

## III.   Conclusion

Having reviewed the relevant pleadings and submissions, as well as the objections to the R&R, I approve and ADOPT the magistrate judge's recommendation in its entirety.

Accordingly, SMG's Motion for Summary Judgment (dkt. no. 50) is DENIED and MetLife's Motion for Summary Judgment (dkt. no. 52) is GRANTED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LYNN BRENNER,
 Plaintiff,

v.                                                    CIVIL ACTION NO. 11-12096-GAO

METROPOLITAN LIFE INSURANCE
COMPANY and SOUTHBORO
MEDICAL GROUP, INC.,
 Defendants.

## REPORT AND RECOMMENDATION ON
## MOTIONS FOR SUMMARY JUDGMENT (#50, #52).

KELLEY, U.S.M.J.

Plaintiff Lynn Brenner brought this action against Defendants Metropolitan Life Insurance
Company ("MetLife") and Southboro Medical Group, Inc. ("SMG") for damages arising out of a
life insurance plan that was issued to her husband, Alan Brenner. The only count at issue here is
Count VI of the amended complaint, a claim for equitable relief for breach of fiduciary duties under
§ 502(a)(3) of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3).
Defendants filed motions for summary judgment (SMG's motion, #50; MetLife's motion, #52);
Plaintiff responded in opposition (#56, #59); and MetLife filed a reply (#62). For the reasons that
follow, I recommend that MetLife's motion for summary judgment be ALLOWED, and that SMG's
motion for summary judgment be DENIED.

## I.  BACKGROUND

Except where otherwise noted, the parties have agreed on the following facts. In June 2004, Dr. Alan Brenner, a rheumatologist, was hired by Southboro Medical Group. (#54 at 1.) Dr. Brenner participated in an employee benefit plan administered by SMG that provided group life insurance coverage. (*Id.*) The plan is an "employee welfare benefit plan" as defined by ERISA. (#53-2 at 54-59.) Dr. Brenner named his wife, Lynn Brenner, as beneficiary of the policy. (*Id.* at 2.) MetLife provided the life insurance; SMG paid premiums to MetLife on behalf of its employees on a monthly basis. (*Id.* at 2-3.)

When MetLife issued the policy, it granted SMG access to an online administrative manual and provided copies of documents for SMG to distribute to plan participants. (#54 at 2.) According to SMG, these documents, (called the "Plan Documents" or "the SMG Plan"), included the MetLife Certificate of Insurance, which contains the terms and provisions of the group policy, and information relevant to ERISA. (*See* #55 at 1.) Defendants claim that SMG provided Dr. Brenner and his wife with the Plan Documents on multiple occasions. (#54 at 2; #55 at 3, 5.) Plaintiff asserts that there are substantial issues of fact about whether Dr. Brenner or Lynn Brenner ever received copies of these documents. (#58 at 2, 3; #61 at 5, 7-8.) Plaintiff further asserts that even if Dr. Brenner was provided with the documents, from the time he became sick until his death, he was "medically incapable of reviewing the SMG Plan even if it was in his possession," and that SMG was aware of his condition. (#58 at 2.)

The Plan Documents provide that, in order to remain eligible for coverage under the policy, an employee must be actively at work, that is, performing all usual duties of his job on a full-time basis, which is defined as thirty or more hours per week. (#54 at 3.) A plan participant's coverage

2

may end on the last day of the month in which he ceases active work, or, a participant's life insurance policy may remain in effect for nine months after he ceases active work if (i) he stopped work because of an injury, illness, or disease, and (ii) SMG continues to pay premiums for the coverage. (*Id.* at 3-4.) The administrative manual provides that if there are changes in an employee's status that may affect his life insurance coverage, it is SMG's responsibility to inform MetLife by completing a form. (*Id.* at 3.)

The Plan Documents provide for a "Conversion Option," allowing a qualified plan participant to convert to an individual policy upon the expiration of his participation in the group policy. (*Id.* at 4.) A participant in group coverage must submit an application if he wishes to convert to an individual policy. (*Id.*) The application period cannot exceed 91 days from the date that the group insurance ends. (*Id.* at 5.)

In 2009, Dr. Brenner began suffering from Guillain-Barre Syndrome, "a neurological autoimmune disease" that left him "paralyzed, unresponsive, and unable to speak or write." (#57 at 2.) As a result of his illness, Dr. Brenner stopped working in March 2009. (#54 at 5.) Because he stopped working due to illness and SMG continued to pay premiums, his life insurance coverage was continued for an additional nine months, through December 31, 2009. (*Id.* at 6.) As Dr. Brenner never submitted an application for the Conversion Option, his employee-sponsored life insurance coverage ended after December 31, 2009, nine months after he ceased active employment. (*Id.*)

Dr. Brenner never returned to work. (*Id.*) Lynn Brenner claims that neither he nor she was informed that the group policy coverage would end on December 31, 2009, nor did they ever receive notice of the right to convert to an individual policy. (Amended Complaint, #16 at 4.) She alleges,

3

however, that from the outset of her husband's illness, she regularly informed Kathryn Tomashunas, SMG's Human Resources Director, about Dr. Brenner's condition and made inquiries about the status of his benefits. (#60 at 2-4, 7.) For instance, in May, 2009, she emailed Tomashunas to ask if her checks for benefits were being received and "to be sure everything is still in place." (#58 at 7.) Tomashunas reponded by asking Jaimee Lazano, a benefits coordinator who worked under her, to "confirm with Lynn Brenner that we have our check and everything is ok." (*Id.*)

Plaintiff also claims that, without her knowledge, in August 2009, Tomashunas checked with the SMG insurance broker, Robert Muenzburg, to get "advice about the best way to proceed" with Dr. Brenner's life insurance. (#60 at 2-3; *see* Tomashunas Deposition, #58-1, at 21, 67.) Tomashunas's purpose in speaking to Muenzberg was to ensure that Dr. Brenner would remain covered under his life insurance policy. (#58 at 8.) Plaintiff states that, based on those conversations, Tomashunas "decided to keep [Dr. Brenner] on the SMG Plan and continue paying his benefits." (#60 at 2-3.)

Tomashunas testified at a deposition that she knew that Dr. Brenner could convert to an individual policy, but she decided not to send the conversion notice or otherwise pursue conversion because she felt that it might be too expensive for him to do so.[1] (#58 at 10.) Tomashunas and Lozano believed that Dr. Brenner would continue to be covered under the policy as long as SMG

---

[1]Tomashunas's testimony at her deposition revealed that she apparently thought that Dr. Brenner might not "get the conversion" if he applied for it. ("Was it for sure he was going to get a conversion? I don't think so considering his condition." #58 at 10.) This appears to be yet another misunderstanding on her part concerning the SMG policy: Plaintiff's amended complaint asserts that "Under the SMG Plan, if a participant chooses to exercise the Conversion Option during the Application Period, evidence of his or her insurability is not required by MetLife." (#16 at 3.)

4

continued to "keep him on the SMG Plan," and did not realize that his enrollment would automatically be terminated nine months after he stopped working. (#55 at 4.)

In January 2010, after Dr. Brenner's coverage had been terminated, Plaintiff asked Tomashunas how much she owed for the life insurance premium for the new year; Tomashunas replied that the premium was $51.56 per month. (*Id.* at 4; emails, #58-3, at 6.) She continued to make premium payments. (#54 at 7.) On Monday, March 29, 2010, Ms. Brenner emailed Tomashunas, explaining that Dr. Brenner was about to die and asking about the status of his life and health insurance. Tomashunas responded by informing her that the life insurance policy was through MetLife in the amount of three times his annual salary, up to $500,000. (*Id.* at 9.)

Dr. Brenner passed away on March 31, 2010. (#54 at 6.) On April 13, 2010, Lynn Brenner made a claim for life insurance benefits. (*Id.* at 7.) On May 13, 2010, and again on July 26, 2010, MetLife sent letters to Plaintiff advising her that benefits were not payable because her husband was not covered by the policy at the time of his death. (*Id.*) In June 2010, SMG returned the premium payments that Plaintiff had paid since the coverage expired. (*Id.*)

Plaintiff alleges that Defendants failed to exercise reasonable care or competence in obtaining or communicating information about the life insurance policy to Plaintiff. (#16 at 8.) Ms. Brenner claims that although Tomashunas knew that Dr. Brenner was incapacitated and was "physically unable to consult the SMG plan," she failed to take steps or precautions to make sure his interests were addressed. Tomashunas admitted in a deposition that SMG has no policy for dealing with a situation where a plan participant is incapacitated and cannot consult the SMG plan. (#60 at 3.)

5

On November 28, 2011, Plaintiff filed a complaint against MetLife and SMG. In her amended complaint, she brought claims for misrepresentation, promissory estoppel, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of contract under ERISA, breach of fiduciary duty under ERISA, unfair claims settlement practices in violation of Massachusetts law, and unfair or deceptive practices in violation of Massachusetts law. (#16 at 6-14.) On Defendants' motions, the Court dismissed all of Plaintiff's state law claims as preempted by ERISA, and her ERISA breach of contract claim as falling outside of the types of claims permitted under that statute. (#32, #35.) Consequently, the only claim that remains in this case is Count VI of the amended complaint, for breach of fiduciary duty under ERISA. *See* 29 U.S.C. § 1132(a)(3).

II.     STANDARD OF REVIEW

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1st Cir. 2005) (internal quotation marks and citation omitted). When considering a motion for summary judgment, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). "Once the moving party avers the absence of genuine issues of material fact, the non-movant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable

inferences, conclusory allegations, or rank speculation." *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal quotation marks and citation omitted).

In determining whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (further internal quotation marks omitted)).

III.   DISCUSSION

A. Legal Standard

An individual plan participant or beneficiary may bring suit for equitable relief from breach of fiduciary duty under ERISA's so-called "catch-all" provision, which provides:

A civil action may be brought--

> ... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) *to obtain other appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3) (emphasis added).

7

In *CIGNA Corp. v. Amara*, —— U.S. ——, 131 S.Ct. 1866, 1880 (2011), the Supreme Court stated that "appropriate equitable relief" under ERISA § 502(a)(3) includes a monetary "make-whole remedy" under the equitable theory of surcharge for a loss resulting from a trustee's breach of duty.[2] In *Amara*, participants in CIGNA Corporation's employee pension plan brought suit alleging that CIGNA had provided inadequate notice of significant changes to the plan. The district court, relying on § 502(a)(1)(B) (which permits a plan participant to bring a civil action to "recover benefits due to him under the terms of his plan"), reformed the plan and ordered CIGNA to pay benefits accordingly. *Id.* at 1876. The Second Circuit affirmed. The Supreme Court disagreed, holding that § 502(a)(1)(B) does not grant a court the power to change the terms of a plan: "The statutory language speaks of '*enforc[ing]*' the 'the terms of the plan,' not of *changing* them." *Id.* at 1877.

The Court stated, however, that § 502(a)(3) authorized entry of the relief the district court provided. *Id.* at 1878. The Court went on to discuss three types of "equitable relief" possible under § 502(a)(3). First, what the district court did in *Amara* "may be regarded as the reformation of the terms of the plan, in order to remedy the false or misleading information CIGNA provided. The power to reform contracts (as contrasted with the power to enforce contracts as written) is a

---

[2]

MetLife argues that *Amara's* pronouncement that monetary damages are available for breach of fiduciary duty under § 502(a)(3) is "nonbinding dicta." As the Fifth Circuit stated in *Gearlds v. Entergy Services, Inc.*, 709 F.3d 448, 452 (5th Cir. 2013), finding that after *Amara*, surcharge was available to a plaintiff: "Even assuming it is dictum ... we give serious consideration to this recent and detailed discussion of the law by a majority of the Supreme Court." As discussed *infra*, the Fourth and Seventh Circuits have also adopted the surcharge remedy based on *Amara's* pronouncements. *See McCravy v. Metropolitan Life Insurance Co.*, 690 F.3d 176 (4th Cir. 2013); *Kenseth v. Dean Health Plan*, 722 F.3d 869 (7th Cir. 2013). In any event, the distinction between "dictum" and "holding" is not at all clear, and lower courts routinely follow "dictum" in higher court's decisions. *See* David Klein and Neal Devins, *Dicta, Schmicta: Theory Versus Practice in Lower Court Decision Making*, 54 William & Mary L. Rev. 2021, 2044 (2013).

traditional power of an equity court, not a court of law, and was used to prevent fraud." *Id.* at 1881 (citations omitted).

Second, the district court's remedy "essentially held CIGNA to what it had promised, namely, that the new plan would not take from its employees benefits they had already accrued. This aspect of the remedy resembles estoppel, a traditional equitable remedy." *Id.*

Third, and most important to this analysis, "equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." The Court explained that prior to the merger of law and equity, this kind of monetary remedy against a trustee, sometimes called a "surcharge," was "exclusively equitable." The surcharge remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary. *Id.*

There is no case in the First Circuit squarely addressing the issue of "equitable surcharge" under *Amara.*³ Three other circuits, however, have ruled that since *Amara*, monetary damages are recoverable under the theory of "surcharge" when a fiduciary violates its duty under § 502(a)(3) . In *Gearlds v. Entergy Services, Inc., supra*, 709 F.3d 448, the Fifth Circuit held that an award of make-whole relief in "the form of surcharge" was available to a plan beneficiary who alleged that his employer breached its fiduciary duty by representing that he was eligible for plan benefits for

---

³ In *Guerra-Delgado v. Popular, Inc.*, 774 F.3d 776 (1ˢᵗ Cir. 2014), the First Circuit ruled that it need not reach the question whether the Court would adopt the theory of "equitable estoppel" under § 502(a)(3), as courts in the Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits have done, because plaintiff there could not make out sufficient facts to support the claim. Some courts have found that the *Amara* decision dictates that the remedy of equitable estoppel be available to plaintiffs under § 1132(a)(3). *See*, e.g., *McCravy v. Metropolitan Life Ins. Co.*, 690 F.3d at 182. At any rate, equitable estoppel is not the same as surcharge, *see, e.g., Gearlds v. Entergy Services, supra*, 709 F.3d at 453; *McCravy, supra* at 182.

the remainder of his life if he opted for early retirement, when he detrimentally relied on the misrepresentations by retiring and continuing with the employer's plan rather than obtaining alternate benefits through his wife's plan. *Id.* at 450-52. The Court found that the district court's dismissal of the claim because money damages were not available under § 502(a)(3) was incorrect and remanded the case. *Id.* at 453.

In *McCravy v. Metropolitan Life Insurance Co.*, *supra*, 690 F.3d 176, the Fourth Circuit addressed a similar case, where a mother paid life insurance premiums for a child for several years only to learn upon the child's death that the child had been ineligible for the coverage. *Id.* at 178. Plaintiff alleged breach of fiduciary duty and sought as damages the amount of the life insurance coverage, because she relied on the representations that her child was covered and so did not seek other insurance. *Id.* at 178. The district court entered summary judgment for the participant but limited her damages to return of the premiums she had paid. *Id.* at 179. The Fourth Circuit initially affirmed the district court, 650 F.3d 414 (4th Cir. 2011). In light of *Amara*, however, which was published the same day as the initial affirmance of the district court's order, plaintiff petitioned for panel rehearing. *Id.* The Fourth Circuit Court of Appeals stated that "with *Amara*, '[a] striking development,' the Supreme Court 'expanded the relief and remedies available to plaintiffs asserting breach of fiduciary duty under [§ 1132(a)(3)] and therefore seeking make-whole relief such as equitable relief in the form of surcharge.'" *Id.* at 180 (quoting Lee T. Polk, *Statutory Provisions- Civil Remedies*, 1 ERISA Practice and Litigation § 5:4 (West 2012) (quotations omitted).

In *Kenseth v. Dean Health Plan*, *supra*, 722 F.3d 869, plaintiff had surgery after speaking by telephone to a customer service representative at her health insurance provider who erroneously informed her that the procedure was covered by insurance. The Seventh Circuit stated that *Amara*

10

"substantially changes our understanding of the equitable relief available under section 1132(a)(3). Kenseth has argued for make-whole relief in the form of monetary compensation for a breach of fiduciary duty from the start of this litigation ... in appropriate circumstances, that relief is available under section 1132(a)(3). See [*Amara*], 131 S.Ct. at 1881–82." The Court remanded for the district court to "address the question of whether [defendant] breached its fiduciary duty and whether that breach was the cause of any harm that [plaintiff] suffered." *Kenseth, supra* at 891-92.

In *Amara*, the Supreme Court said that "a fiduciary can be surcharged under § 502(a)(3) only upon a showing of actual harm - proved (under the default rule for civil cases) by a preponderance of the evidence. That actual harm may sometimes consist of detrimental reliance, but it might also come from the loss of a right protected by ERISA or its trust-law antecedents." 131 S. Ct. at 1881. In sum, "[t]he identity of the defendant as a fiduciary, the breach of a fiduciary duty, and the nature of the harm are important in characterizing the relief. " *Kenseth, supra*, 722 F.3d at 880.

Under ERISA, one is a fiduciary to the extent that:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

"A fiduciary named in an ERISA plan can undertake non-fiduciary duties, and a party not identified as a plan fiduciary can become one if, but only to the extent that, he or she undertakes discretionary tasks related to the plan's management or administration." *Livick v. The Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008) (citing *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (employer can switch

between wearing its "fiduciary" and "employer" hats); *Beddall v. State St. Bank & Trust Co.*, 137

F.3d 12, 18 (1st Cir.1998) (person can become fiduciary to extent she undertakes fiduciary duties)).

"Thus in cases alleging breach of ERISA fiduciary duty, 'the threshold question is not whether the

actions of some person employed to provide services under a plan adversely affected a plan

beneficiary's interest,' .... but whether that person was acting as a fiduciary (that is, was performing

a fiduciary function) when taking the action subject to complaint." *Livick, supra,* 524 F.3d at 29,

(quoting *Pegram, supra,* 530 U.S. at 226).

Plan administrators can be deemed to be wearing their "fiduciary hats" when interpreting

plan documents for participants and giving advice about future benefits. As the Supreme Court has

explained:

> The ordinary trust law understanding of fiduciary 'administration' of
> a trust is that to act as an administrator is to perform the duties
> imposed, or exercise the powers conferred, by the trust documents.
> The law of trusts also understands a trust document to implicitly
> confer 'such powers as are necessary or appropriate for the carrying
> out of the purposes' of the trust. Conveying information about the
> likely future of plan benefits, thereby permitting beneficiaries to
> make an informed choice about continued participation, would seem
> to be an exercise of a power 'appropriate' to carrying out an
> important plan purpose. After all, ERISA itself specifically requires
> administrators to give beneficiaries certain information about the
> plan. *See,* e.g., ERISA §§ 102, 104(b)(1), 105(a). And administrators,
> as part of their administrative responsibilities, frequently offer
> beneficiaries more than the minimum information that the statute
> requires-for example, answering beneficiaries' questions about the
> meaning of the terms of a plan so that those beneficiaries can more
> easily obtain the plan's benefits.

*Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) (citations omitted).

B. MetLife

In this lawsuit, Plaintiff claims that Defendants both are liable to her under ERISA for breach of fiduciary duty because of their "conduct [as] described [in the complaint], including but not limited to Defendants' failure to provide notice about Dr. Brenner's Conversion Option despite Plaintiff's inquiries about the status of Dr. Brenner's life insurance policy under the SMG plan." (#16 at 11.) Plaintiff also contends in her Opposition that the "conduct described in the complaint" includes allegations that "MetLife recommended to keep Dr. Brenner on the SMG Plan rather that pursuing the conversion option" and "newly discovered evidence that MetLife denied Dr. Brenner's claim on the basis that he was in possession of the SMG Plan document, even though in actuality Dr. Brenner was incapacitated and totally incapable of reviewing the Plan." (#57 at 9.)

MetLife concedes that, in a broad sense, it is a fiduciary with respect to the life insurance plan because it has "discretionary authority to determine an employee's eligibility for and entitlement to Plan benefits." (#53 at 9.) It argues, however, that the actions that Plaintiff attributes to it are not fiduciary acts, so that it cannot be deemed a fiduciary for purposes of the claims in this case. (*Id.*) In so arguing, MetLife first points out that Plaintiff's primary allegation against it concerns its failure to send an individual notice to Dr. Brenner of the right to convert the policy. (#53 at 10; #62 at 2 n.1; see #16 at 11.) MetLife argues that "provision of such notice is not a fiduciary act, but rather is a non-fiduciary, ministerial function." (#53 at 10.) The company further notes that ERISA does not require that notice of a participant's conversion rights be provided individually to a plan's participants when the right to convert is approaching. See *Prouty v. The Hartford Life & Acc. Ins. Co.*, 997 F. Supp.2d 85, 90 (D. Mass. 2014). MetLife argues, as well, that to the extent Plaintiff accuses it of other breaches of fiduciary duty, they also fall into the category of ministerial, non-fiduciary acts. (#62 at 2 n.1.)

13

Under the law, merely performing administrative duties, including "advising participants of their rights and options under the plan," is not treated as a fiduciary function. See 29 C.F.R. § 2509.75-8; *Walker v. Federal Exp. Corp.*, 492 Fed. Appx. 559, 565 (6th Cir. 2012); *Barrs v. Lockheed Martin Corp.*, 287 F.3d 202, 207-08 (1st Cir. 2002); *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 854-55 (7th Cir. 1997). Even a named plan fiduciary does not have to provide "unsolicited advice" or "inform beneficiaries every time a plan term affects them." *Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 115 (1st Cir. 2002); see *Barrs*, 287 F.3d at 207-08. Also, the obligation to distribute plan information is generally placed only on the plan administrator, and not on every fiduciary. See *Prouty*, 997 F. Supp.2d at 89-90 (citing *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008); *Kenna v. Hartford Life & Acc. Ins. Co.*, 2005 WL 2175158, at *16 (D.N.H. 2005)). As discussed in more detail in the section about SMG, the Plan Documents expressly designate SMG, not MetLife, as the "Plan Administrator." (Plan Documents, #51-1 at 53.) In general, then, MetLife would not be considered liable for failing to send an individual notice of conversion or to otherwise advise the Brenners of their rights. In order to succeed on her claims, then, Plaintiff has to present evidence that MetLife nonetheless owed her a fiduciary duty in this case.

It is undisputed that the Plan Documents contained detailed, comprehensible information about the plan, including information about applying for a conversion. (See #54 at 3-5; #51-1 at 26, 37-38.) As a result, it appears to comply with ERISA, which states that a plan description need only be "written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1); see *Howard v. Gleason Corp.*, 901 F.2d 1154, 1160 (2d Cir. 1990). Tomashunas testified in her deposition that SMG gave

14

Dr. Brenner a copy of the Plan Documents when he began employment, and again when MetLife became the policy issuer. (#58-1 at 27, 39.) Plaintiff's testimony that she does not know whether Dr. Brenner ever received a copy of the policy does not rebut that evidence. (*See* Brenner Deposition, #58-2, at 13.) Plaintiff offers testimony that she herself never received a copy of the policy. (*Id.*) She has cited no authority, however, for a claim that MetLife had a duty to give a separate copy of the policy to beneficiaries. Plaintiff argues that MetLife should have sent her a copy of the plan or the notice of conversion option because Dr. Brenner could not read or write. (#58 at 2-3.) There is, however, scant evidence that MetLife was aware of that condition. While Tomashunas admitted that she became aware at some point that Dr. Brenner was incapacitated, she testified that she does not recall whether she mentioned that to anyone. (#51-2 at 10; #62-1 at 67, 134.) There is no reliable evidence that in August, 2009 when Tomashunas called the insurance broker to ask about Dr. Brenner's insurance coverage that she informed the broker about Dr. Brenner's condition. In fact, the evidence from Tomashunas about this conversation was that Dr. Brenner was "improving tremendously" at that time. (*See* #62 at 5.) Under those circumstances, MetLife had no reason to ensure that Ms. Brenner had her own copy of the policy. And even if it did, Plaintiff has not shown that such a duty would rise above the level of a nonfiduciary, ministerial duty. See *Livick*, 524 F.3d at 29.

In addition, nothing in the Plan Documents requires MetLife to give a participant a separate notice of the right to convert when the time comes to make such a choice. The plan sets an overall deadline for applying for conversion of 91 days. (#53-2 at 36.) The fact that it also sets out shorter deadlines "[i]f you are given Written notice of the option to convert" does not mean that participants are guaranteed receipt of such notice. (*Id.*) Further, even if MetLife had a general duty to send such notice, there is no competent evidence that the company had reason to know that Dr. Brenner

required such notice. Plaintiff points to Tomashunas's testimony that, in August 2009, she talked to Muenzburg, "just making sure that we were ... doing everything correctly about his [insurance]." (#58-1 at 21.) Tomashunas testified that Muenzburg "called [her] back the next day and said that he talked to MetLife and to leave him on the plan which is what we did." (*Id.* at 27-30.) Plaintiff admits that this is hearsay, and that there is currently no testimony in the record from Muenzburg himself, although there might be at trial. (#57 at 14 n.3.) At this juncture, Plaintiff has simply submitted no proof that Muenzburg knew the particulars of Dr. Brenner's condition or that he informed MetLife of it. Nor has Plaintiff produced competent evidence that MetLife gave SMG advice about Dr. Brenner's policy. Further, even if it had, August 2009 was well in advance of the time to convert, so advice to keep Dr. Brenner on the policy made sense. Moreover, there is no evidence that MetLife was aware that Dr. Brenner had not returned to work by December 31, 2009, when his group coverage ended.

On the other hand, MetLife has presented evidence that it never received notice of Dr. Brenner's condition. In a sworn declaration, Corey Brammer, an account management consultant for MetLife, states that the administrative manual given to SMG "provides that SMG must report to MetLife any changes in an employee's status that may affect his or her group life insurance coverage by completing a change request form." (Brammer Declaration, #53-1, at 2.) Brammer wrote that "SMG neither reported a change of status nor submitted a change request form to MetLife for Dr. Brenner." (*Id.* at 3.) Clearly, if MetLife was unaware of Dr. Brenner's condition, it was in no position to take action to help him. Finally, Plaintiff argues that, because MetLife was aware of Dr. Brenner's condition, its acceptance of premium payments after December 31, 2009, weighs in favor of a finding of liability. Again, however, there is no evidence that MetLife was aware of Dr. Brenner's condition during the relevant time period. Further, while Ms. Brenner testified that she

could not recall to whom she made premium payments, MetLife has submitted evidence that all payments made to MetLife were submitted by SMG, rather than by Plaintiff. (#53-1 at 2; #62-1 at 4-5.) As a result, Plaintiff has not shown that MetLife breached a fiduciary duty to her.

In sum, Plaintiff has not shown that there is a genuine issue of material fact that MetLife was acting as a fiduciary for purposes of her claims. For that reason, the Court recommends the entry of summary judgment in favor of MetLife.

### C. Southboro Medical Group

In its motion, SMG denies that it "qualif[ies] as a named or functional fiduciary under ERISA with regard to any aspects of the conversion coverage at issue." (#51 at 13.) SMG was Dr. Brenner's employer. Generally, an employer is not a proper party to a claim for enforcement of the terms of the plan under ERISA § 502(a), unless "it is the designated plan administrator or fiduciary .... [or] it is the employee benefit plan's sponsor and no other administrator or fiduciary has been designated." *Lampron v. Group Life Ins. & Disability Plan of United Tech. Corp.*, 2013 WL 2237851, at *5 (D. Me. 2013) (citing *Beegan v. Associated Press*, 43 F. Supp.2d 70, 73 (D. Me. 1999)); see *LeBlanc v. Sullivan Tire Co.*, 526 F. Supp.2d 75, 82 (D. Me. 2007). In this case, however, the Plan Documents expressly designated SMG as the "Plan Administrator." (#51-1 at 53). A "Plan Administrator" is widely considered to be a fiduciary for purposes of ERISA claims. See *Prouty*, 997 F. Supp.2d at 89-90; *Law v. Ernst & Young*, 956 F.2d 364, 372 (1st Cir. 1992). Further, the Plan Documents refer to the Plan Administrator as a "fiduciary":

> **Discretionary Authority of Plan Administrator**
> **and Other Plan Fiduciaries**
>
> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of

17

> the Plan. Any interpretation or determination made pursuant to such
> discretionary authority shall be given full force and effect, unless it
> can be shown that the interpretation or determination was arbitrary
> and capricious.

(#51-1 at 57.) SMG points out that the Plan Documents make it clear that only MetLife handles the

review of claims, applications for conversion, and payment of benefits. (See, e.g., *id.* at 49; #51 at

4-5.) However, under ERISA, an entity need not do those things to be a fiduciary; it is sufficient

that one have "any discretionary authority or discretionary responsibility in the administration of

such plan." 29 U.S.C. § 1002(21)(A); see *Varity Corp.*, 516 U.S. at 498. As a result, given the

provision above, SMG certainly has a fiduciary position with respect to the plan.

As addressed above, merely performing administrative duties is not treated as a fiduciary

function. See 29 C.F.R. § 2509.75-8; *Walker*, 492 Fed. Appx. at 565; *Watson*, 298 F.3d at 115;

*Barrs*, 287 F.3d at 207-08. Also, without more, a failure to send an individual notice of conversion

does not give rise to a breach of fiduciary duty claim. See *Prouty*, 997 F. Supp.2d at 90. There is

evidence, however, that reveals an issue of fact about whether SMG was acting in a fiduciary

capacity with regard to the Brenners' situation.

As a preliminary matter, SMG failed to comply with its obligations concerning notice to

MetLife or to Dr. Brenner under the rules set out in the Plan Documents and the administrative

manual. In his sworn declaration, Brammer, an account management consultant for MetLife, stated

that the administrative manual "provide[d] that SMG must report to MetLife any changes in an

employee's status that may affect his or her group life insurance coverage," but SMG failed to do

so here. (#53-1 at 2.) In addition, Brammer states that among the materials MetLife gave to SMG

was advice "to complete and then give or mail a Notice of Group Life Insurance Conversion

Privilege form (the 'Conversion Notice') to their employees eligible to convert their group life

18

insurance coverage to an individual policy 'as soon as possible' after the employee's group coverage ends." (#53-1 at 2.) A document titled "Notice of Group Life Insurance Conversion Privilege" was provided to SMG. That document contained instructions to the "policyholder/recordkeeper," which was SMG, to "Complete this Notice and provide a copy to the employee when group coverage terminates or reduces." (*Id.* at 2; #53-5.) In her deposition, Lozano testified that she regularly gave the conversion form to employees when their employment was terminated. (Lozano Deposition, #53-10, at 74-76.) At the least, then, there is a preliminary issue of fact about whether SMG was required to give MetLife notice of the changes in Dr. Brenner's status, or give Dr. Brenner the Notice of Conversion form, as set out in the Plan Documents and manual.

The failure to send such notices, alone, is not sufficient for a claim for breach of fiduciary duty, but additional evidence makes summary judgment inappropriate here. The evidence shows that Tomashunas developed a relationship of trust with Plaintiff; took an active role in ensuring that Dr. Brenner's life insurance coverage remained intact; made ill-informed decisions about whether Dr. Brenner should apply for a conversion without consulting the plan materials or Plaintiff; and repeatedly communicated with Plaintiff about the insurance requirements in such a way as to suggest to her that she was following the requirements for keeping the insurance coverage intact.

For example, in her deposition, Plaintiff testified that she contacted Tomashunas in the Spring of 2009 because she wanted to know what happened now that her husband was not getting a paycheck. (#58-2 at 11.) On April 13, 2009, Tomashunas sent Plaintiff an email, stating "Hi, Lynn. Sorry that Alan is still in ICU." (#58-1 at 15; #58-3 at 2.) On July 15, 2009, Ms. Brenner sent Tomashunas another email, stating that Dr. Brenner was "improving tremendously but he still cannot talk or write." (#58-1 at 16-17; #58-3 at 5.) In these communications, they discussed Dr. Brenner's condition, and Plaintiff once expressed gratitude for a floral arrangement sent to her by the company.

19

In August 2009, Tomashunas contacted the SMG broker, Robert Muenzburg, "just making sure that we were ... doing everything correctly about his [insurance]." (#58-1 at 21.) She testified that Muenzburg "called me back the next day and said that he talked to MetLife and to leave him on the plan which is what we did." (*Id.* at 27-30.) Tomashunas did not inform Plaintiff of these alleged communications, but apparently based her decision to go forward without the conversion option based on them. An email dated January 19, 2010, shows that Plaintiff asked Tomashunas "for a new rundown of [her] monthly payout to SMG for Life, LTD, STD, Dental, Medical (no Flex)" because she "assume[d] it must be a different monthly from 2009." (#58-3 at 6.) On January 22, 2010, Tomashunas sent her a list of monthly payments, including "Life Insurance: 51.56." (Id.) On March 29, 2010, Plaintiff sent Tomashunas the following email:

> This is a very sad message to send. We don't expect Alan to survive past Wednesday. He had a catastrophic medical setback that his body cannot compensate for. I need to know ASAP what happens to my health insurance on his passing. Do I have a grace period on Cobra or am I suddenly without insurance? Any help you can give me will be greatly appreciated. Also can you give me the $$ of his life insurance?? Lynn

(#58-3 at 7.) On March 30, 2010, Tomashunas replied, stating, in relevant part, "The life insurance policy is through METLIFE and is for three times annual salary up to $500,000." (*Id.* at 8.)

Thus, uncontroverted evidence demonstrates that Tomashunas repeatedly reassured Plaintiff that she was properly securing insurance, without ever warning Plaintiff that her advice might be incorrect or that Plaintiff should consult the Plan Documents for correct information. Given that Tomashunas knew that Dr. Brenner was "incapacitated," her communications with Plaintiff assumed great importance, as she knew that Plaintiff was acting on Dr. Brenner's behalf and he was helpless to direct her. Finally, Tomashunas took it upon herself not to provide Plaintiff with the conversion option or even discuss the option with Plaintiff, who was obviously relying on her for guidance.

These actions not only constitute evidence that SMG involved itself in the Brenners' situation beyond mere ministerial tasks, they could warrant a finding of breach of fiduciary duty. The Supreme Court has held that an employer may engage in plan administration, and therefore act as a fiduciary, when it "answer[s] beneficiaries' questions about the meaning of the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits." *Varity Corp.*, *supra*, 516 U.S. at 502-03; accord *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 84 (2d Cir. 2001). As the Second Circuit has held, fiduciary duties can be breached by material omissions, see *Devlin v. Empire*, 274 F.3d at 88 (noting that breach occurs when plan administrator "fails to provide information when it knows that its failure to do so might cause harm" (internal quotation marks omitted)), as well as by negligent material misrepresentations, see *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 10 (2d Cir.1997).

The situation in this case is similar to that in *McCravy, supra*, 690 F.3d at 178-9, where the plan administrator led plaintiff to believe her daughter was covered under the life insurance policy and so breached its fiduciary duty, or *Kenseth, supra*, 722 F3d at 881, where the court described how the plaintiff was lulled by the plan administrator "into believing that she had coverage for an expensive operation, only to reverse course after the procedure was performed, leaving her with a stack of medical bills." See also *Gearlds, supra*, 709 F.3d at 452 n.1 (employer's misrepresentations concerning plaintiff's benefits that caused him to retire early and lose benefits "at least plausibly alleged a breach of fiduciary duty"),(citing *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 57 F.3d 1255, 1264 (3rd Cir. 1995) ("[W]hen a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries.")).

In sum, SMG has failed to meet its burden to show that there is no genuine issue of material fact on Plaintiff's claim against it.

## IV.   CONCLUSION

For the reasons stated above, the Court recommends that MetLife's motion for summary judgment (#52) be ALLOWED, and that SMG's motion for summary judgment (#50) be DENIED.

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.   The objections must specifically identify the portion of the recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review.  See *Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); see also *Thomas v. Arn*, 474 U.S. 140 (1985).


                                                /s / M. Page Kelley
                                                M. Page Kelley
March 3, 2015                                   United States Magistrate Judge

22